AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
JAN - 6 2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____rsm_____ DEPTUY

| United States of America | |
|---|---|
| v. | Case No. |
| GEORGE HARRISON,<br>CHASE KENNEDY, | **2:25-mj-00029-DUTY** |
| Defendants | |

FILED
CLERK, U.S. DISTRICT COURT
JAN - 6 2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____rsm_____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about October 28, 2024 in the County of Ventura in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) | Possession of a Controlled Substance with Intent to Distribute |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

_____
*Complainant's signature*

Luis A. Soto-Afante, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    01/06/25

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. A. Joel Richlin, U.S. Magistrate Judge
*Printed name and title*

AUSA: Alexander H. Tran x0758

**<u>ATTACHMENT A</u>**

<u>PROPERTY TO BE SEARCHED</u>

The following digital device (the "SUBJECT DEVICE"), seized on November 12, 2024, is currently maintained in the custody of the Ventura County Sheriff's Office in Ventura, CA: Red iPhone with blue case.

 

## ATTACHMENT B

**I.    ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), namely:

a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

e.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

f.    Contents of any calendar or date book;

g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

h.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

II.    __SEARCH PROCEDURE FOR THE SUBJECT DEVICE(S)__

3.    In searching the SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICE(S) as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also

search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.  If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the

government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      i.    The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      j.    After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    4.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

    5.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Luis A. Soto-Afante, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrants against GEORGE HARRISON ("HARRISON") and CHASE KENNEDY ("KENNEDY") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.   This affidavit is also made in support of an application for a warrant to search a Red iPhone with blue case ("SUBJECT DEVICE"), currently in the custody of the Ventura County Sheriff's Office, in Ventura, California, as described more fully in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth

all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am currently a Special Agent ("SA") with the Drug
Enforcement Administration ("DEA"), Los Angeles Field Division,
Ventura Resident Office ("VRO") and have been employed in this
capacity since May 2023.  I am an investigative and law
enforcement officer of the United States within the meaning of
18 U.S.C. § 2510(7), and I am empowered by law to conduct
investigations of, and to make arrests for, the offenses
enumerated in 18 U.S.C. § 2516.

6.    During the course of my employment, I have received
comprehensive, formal instruction on such topics as drug
identification; money laundering techniques; patterns of drug
trafficking; complex conspiracies; the exploitation of narcotics
traffickers' telecommunications devices; criminal law;
surveillance; and other investigative techniques.  I have
assisted in investigations into the unlawful importation,
manufacture, possession with intent to distribute, and
distribution of narcotics (including cocaine, heroin, and
methamphetamine, the laundering of narcotics proceeds, and
conspiracies associated with narcotics offenses.  In conducting
these investigations, I have utilized a variety of investigative
techniques and resources, including but not limited to such
techniques as surveillance, and confidential sources.

7.    I have received training and have experience investigating violations of federal narcotics and money laundering laws, including but not limited to, 21 U.S.C. §§ 841, 846, 952, 959 and 963, and 18 U.S.C. § 1956(a).  I have discussed with other agents that have been involved in various electronic surveillance methods, the process of debriefing of defendants, informants and witnesses, and discussed with other agents who have knowledge of the manufacturing, distribution, transportation, storage and importation of controlled substances and the laundering of drug proceeds.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    On October 28, 2024, a Ventura County Sheriff's Office ("VCSO") deputy conducted a traffic stop in Ventura County after observing a vehicle with an expired registration.  During the traffic stop, the deputy learned that both the driver (Chase KENNEDY) and passenger (George HARRISON) did not possess valid driver's licenses.  The deputy impounded the car and conducted a search of the vehicle.

9.    During the search, the deputy found approximately a kilogram of fentanyl in a brown brick shaped package underneath the passenger's seat where HARRISON was sitting.  The deputy arrested both KENNEDY and HARRISON for state drug offenses. Officers later found $825.00 in various denominations in HARRISON's wallet.  The VCSO laboratory tested the substance in the brown package, which tested positive for fentanyl with a net weight of approximately 991.5 grams.

10.  Law enforcement officers subsequently discovered text messages on KENNEDY's cell phone showing that HARRISON and KENNEDY were purchasing fentanyl in Los Angeles to distribute in Ventura County.

11.  VCSO officers later executed a state search warrant at HARRISON's residence in Ventura County and found approximately 40 grams of fentanyl and evidence of drug distribution at his house, including digital scales and drug packaging materials.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    October 28, 2024: Ventura County Sheriff's Deputy Conducted a Traffic Stop**

13.  From my review of law enforcement reports, pictures, and videos, I know that on October 28, 2024, VCSO Deputy Guerrero was working uniformed patrol in the unincorporated area of Ventura known as "Saticoy."  Deputy Guerrero observed a 2006 Chrysler Sebring bearing California license plate number 9ERB732 traveling northbound on Vineyard Avenue at a high rate of speed. Deputy Guerrero searched the license plate using the Department of Motor Vehicles (DMV) database and learned that the registration was expired as of November 8, 2023, in violation of Cal. Veh. Code § 4000(a)(1) (Expired Registration). Furthermore, the license plate contained a current "2024" registration sticker, which Deputy Guerrero believed was a

possible violation of Cal. Veh. Code § 4462.5 (False Evidence of Registration).

14.  Deputy Guerrero initiated a traffic stop of the vehicle in the area of Los Angeles Avenue and County Drive in Saticoy.  During the traffic stop, Deputy Guerrero contacted KENNEDY in the driver's seat and HARRISON in the front passenger's seat.

15.  During their conversation, KENNEDY informed Deputy Guerrero that he did not possess a valid driver's license. HARRISON also told Deputy Guerrero that he did not have a valid driver's license.

16.  Deputy Guerrero conducted an inquiry of KENNEDY and HARRISON through VCSO's Dispatch and confirmed that both KENNEDY and HARRISON had suspended licenses.  Deputy Guerrero thus believed that KENNEDY was driving on a suspended driver's license in violation of Cal. Veh. Code § 14601.1(a) (Driving on a Suspended License).  Based on the fact that KENNEDY was driving on a suspended California driver's license and consistent with VCSO policy, Deputy Guerrero elected to tow the vehicle pursuant to Cal. Veh. Code § 22651(p).

**B.    The VCSO Deputy Conducted a Search of the Vehicle and Found a Kilogram of Fentanyl**

17.  During an inventory search of the vehicle prior to towing and storing the vehicle, Deputy Guerrero discovered a rectangular shaped package wrapped in brown duct tape and sealed in a vacuum sealed bag under the front passenger seat.  This

package was directly beneath where HARRISON was seated in the vehicle.

18.   Based on Deputy Guerrero's training and experience, he recognized the package to be consistent with a kilogram of narcotics.  Deputy Guerrero placed KENNEDY and HARRISON under arrest for violating Cal. Health & Safety Code § 11351 (Possession for Sale of a Controlled Substance) and Cal. Health & Safety Code § 11352 (Sell/Transport a Controlled Substance).

19.   VCSO Deputy Malagon assisted Deputy Guerrero and conducted a search of HARRISON's person incident to his arrest. Deputy Malagon located a black colored Apple iPhone in a green protective case in HARRISON's right front pants pocket.  Deputy Malagon also located a wallet in HARRISON's rear pants pocket. During a search of HARRISON's wallet, deputies located approximately $825 in United States currency in various denominations.  Deputy Guerrero also located KENNEDY's blue colored Samsung smartphone on the center console of the vehicle.

20.   The VCSO Crime laboratory later tested the narcotics, which tested positive for fentanyl with a net weight of 991.5 grams.

### C.   HARRISON Made Suspicious Jail Calls After His October 28 Arrest

21.    From my conversations with VCSO Detective Woodward, I know that on October 30, 2024, Detective Woodward accessed the Ventura County inmate telephone system to monitor recorded telephone calls made by HARRISON in the Pre-Trial Detention Facility booking cell.

22.  Detective Woodward spoke to Pre-Trial Detention Facility Classification Deputy Steve Rivera, who told Detective Woodward that HARRISON was the only inmate in Booking Cell #7 on October 29, 2024 from 3:03 a.m. to 4:06 a.m. and October 29, 2024 from 4:26 a.m. to 8:50 a.m.  Detective Woodward monitored the calls placed from Booking Cell #7 during that time frame. Detective Woodward told me the following:

a.  On October 29, 2024, at approximately 3:06 a.m., HARRISON placed an outgoing telephone call to "Biker Bail Bonds".  HARRISON identified himself as "George Harrison" and provided his birthday.  HARRISON inquired about how to bail out of custody.  The bail bondsman asked HARRISON for the identity of a co-signer.  HARRISON stated his wife, S.H. could co-sign for HARRISON's bail bond.  HARRISON provided his wife's telephone number as ending in -0656 (the "-0656 number").  The bail bondsman asked HARRISON for his current address. HARRISON responded, "344 Dana Point Avenue."  The bail bondsman also asked HARRISON for his cellular telephone number.  HARRISON responded with a phone number ending -8484 (the "-8484 number").

b.  On October 29, 2024, at approximately 4:51 a.m., HARRISON placed an outgoing telephone call to telephone number ending in -0656 and spoke to a female subject during the telephone call.  The -0656 number is the same phone number HARRISON previously identified as belonging to his wife, S.H. Detective Woodward conducted an inquiry into telephone number -0656 using a law enforcement database and learned the telephone number was subscribed to Verizon Wireless, registered to a

female with the same first name at 344 Dana Point Avenue in
Ventura, California -- the same residence HARRISON previously
identified as his own.

23.  At the beginning of the telephone call, HARRISON's
wife reminded HARRISON that they were being recorded and "this
is not a private call."  HARRISON told her that law enforcement
seized his cell phone as evidence.  HARRISON instructed her to
go on HARRISON's iPad and log into his "iCloud" account.
HARRISON told her to "take my phone off of there."  HARRISON
stated the iPad is "hooked up" to his (HARRISON's) Apple iCloud
account.  HARRISON's wife stated she did not know how to
complete the task.  HARRISON again told her to "take my phone
off."  HARRISON's wife stated she looked on "find my iPhone,"
which indicated HARRISON's phone was located in Camarillo.

24.  Based on my background, training, and experience as a
narcotics investigator, I know that suspects involved in the
trafficking of controlled substances commonly utilize their
cellular phones to communicate, plan, and coordinate narcotics
transactions.  I also know suspects will commonly attempt to
delete evidence located within cellular phones from a remote
location.  I believe HARRISON was instructing his wife to delete
the information from his cellular phone using HARRISON's Apple
iCloud account to destroy or hide evidence.

25.  Approximately three minutes and 21 seconds into the
telephone call, HARRISON also stated, "Stupid Chase [KENNEDY]
wanted to go through El Rio to get fucking back to our house.
I'm like, why do you do that homie? He got pulled over going

through El Rio twice the other day. And I go, don't go through El Rio. It's bad. It's just a hot spot you know?" HARRISON's wife responded, "Yeah." HARRISON continued, "So he drove through El Rio to get home and I was all, why are you going this way dude? He said this is the way I go. I'm like, alright and what do you know?" HARRISON then made noises imitating siren sounds.

26. Based on his background, training, and experience as a narcotics detective, Detective Woodward believed HARRISON was describing the events prior to being pulled over by Deputy Guerrero in Saticoy. HARRISON told the female subject that he knew "Chase" KENNEDY had previously been pulled over by law enforcement in that area. HARRISON described El Rio as a "hot spot," indicating that HARRISON knew there was a heavy law enforcement presence. Based on HARRISON's statements on the jail call where HARRISON said he advised KENNEDY not to travel through El Rio, Detective Woodward believed HARRISON acknowledged the presence of the narcotics in the vehicle. Additionally, based on my knowledge of the area and after discussions with Detective Woodward, I know that KENNEDY and HARRISON were traveling through the El Rio area when Deputy Guerrero first observed the Chrysler Sebring.

   **D.   KENNEDY's Cell Phone Contained Evidence of Drug Trafficking Activity with HARRISON**

27. From my discussions with Detective Woodward and review of law enforcement reports, I know that Detective Woodward authored a search warrant to conduct a forensic download of

KENNEDY's Samsung smartphone and HARRISON's black Apple iPhone in a green protective case for evidence of narcotics sales. The search warrant was signed by Ventura County Superior Court Judge Dusty Kawai on October 30, 2024.

28. Detective Woodward submitted the cellular telephones to the Southern California High Tech Task Force (SCHTTF) on October 30, 2024. VCSO Detective Fillmore assisted Detective Woodward with the cellular phone downloads. Detective Fillmore advised Detective Woodward he was only able to execute a limited extraction of HARRISON's Apple iPhone. During a limited extraction of HARRISON's Apple iPhone, Detective Woodward learned the cellular telephone number associated with the device ended in -8484. Detective Woodward recognized the -8484 number to be the same as the telephone number HARRISON provided to the bail bondsman during the recorded jail call.

29. Detective Fillmore was able to complete a forensic download of KENNEDY's Samsung smartphone pursuant to the search warrant. Detective Woodward and I reviewed the forensic download and observed a text message chain between KENNEDY and HARRISON using the -8484 number. The contact name listed for HARRISON in KENNEDY's phone was "George Haul." The following is a summary of some of the text message communications:

30. September 22, 2024 from 5:10 p.m. to 7:15 p.m.:

HARRISON: [Sent photograph of pink substance in plastic packaging]

KENNEDY: "What is that!"

HARRISON: "Fetty wap"

HARRISON: "It burns weird. Like the old black crispy trails but it's good"

KENNEDY: "Why don't you tell me when your gonna get something? I was calling to tell you I had got a line on something"

HARRISON: "You were calling me what right now?"

KENNEDY: "No, I guess I mean text. When I just texted you saying what's up"

KENNEDY: "It's not a big deal, I just wish you'd let me know. We're a team"

HARRISON: "I gave the money to them this morning."

HARRISON: "This all they had"

KENNEDY: "It's all good. You think I could get a rip and try it? I'm our and about"

HARRISON: "I'm not home"

KENNEDY: "Oh. Ok no stress"

HARRISON: "This stuffs no good now that I sat down and smoked it. I'm going to trade it out for new stuff when they get back from la"

31.  Based on Detective Woodward's background, training, and experience as a narcotics investigator, he recognized the pink substance in the photograph sent by HARRISON to be fentanyl.  Additionally, HARRISON described the substance as "fetty wap."  Detective Woodward knew that "fetty" is a commonly used slang term to describe fentanyl.  HARRISON complained to KENNEDY about the quality of the product.  KENNEDY replied that he wished HARRISON would have told him (KENNEDY) that HARRISON

was obtaining a supply of fentanyl.  KENNEDY added he (KENNEDY) "had a line on something."  Based on my discussions with Detective Woodward and my training and experience, I believe KENNEDY was referring to being in contact with someone who could supply KENNEDY and HARRISON with narcotics.  KENNEDY added, "we're a team."  Based on this information, I believe KENNEDY was stating he and HARRISON are a "team" in obtaining and distributing controlled substances for profit.

32.  October 28, 2024 from 11:54 a.m. to 5:15 p.m.:

HARRISON: "Hey, dude said today"

HARRISON: "La bound son"

KENNEDY: "Right on. I'm ready"

KENNEDY: "When do you want to go"

HARRISON: "I'm going to find out rn"

KENNEDY: "What happened?"

HARRISON: "He hasn't text me the address"

KENNEDY: "Damn...what a bummer. Somebody had hit me up to help with a little paint job, but I told him to go fuck himself cause I got cooler things to do!"

HARRISON: "Hey, I got an address"

KENNEDY: "Lol ok So we going?"

HARRISON: "What's so funny"

HARRISON: "I missed the joke"

KENNEDY: "What?"

HARRISON: "You laughed out loud"

KENNEDY: "Oh, like out of relief"

HARRISON: "But yea, shoot over in 20"

KENNEDY: "Ok"

KENNEDY: "On my way"

KENNEDY: "I'm here"

HARRISON: "Ok. Be right out"

33.  The above text message communication occurred on the same day KENNEDY and HARRISON were arrested with a net weight of 991.5 grams of fentanyl in Ventura County.  HARRISON advised KENNEDY that he (HARRISON) received notification that an event would occur later in the day.  HARRISON stated, "LA bound son." Based on this information and after my discussions with Detective Woodward, I believe HARRISON was advising KENNEDY they would travel to Los Angeles later in the day.  HARRISON stated he was waiting on a third party to text HARRISON the address where they would meet.

34.  Based on my training and experience and my discussions with other law enforcement agents, I know suspects commonly communicate with their sources of supply prior to engaging in bulk quantity narcotics transactions.  I believe HARRISON was waiting for his source of supply of narcotics to send him an address to a meet location, so HARRISON and KENNEDY could engage in the narcotics transaction.  Based on the text message communication, I believe KENNEDY agreed to drive HARRISON to Los Angeles to obtain a kilogram of fentanyl.  I further believe the timeframe of the above text messages was consistent with KENNEDY and HARRISON traveling to Los Angeles and back to Ventura County prior to being pulled over by Deputy Guerrero.

**E.    November 12, 2024: VCSO Detectives Found Approximately
40 Grams of Fentanyl, Drug Distribution Materials, and
the SUBJECT DEVICE at HARRISON's Residence**

35.    From my conversations with Detective Woodward and
review of law enforcement reports, I know that Detective
Woodward authored a search warrant for HARRISON and his
residence of 344 Dana Point Avenue in Ventura, California.  The
search warrant was signed by Ventura County Superior Court Judge
Paul Feldman on November 7, 2024.  On November 12, 2024, at
appropriately 11:40 a.m., VCSO detectives executed the search
warrant.

36.    During a search of HARRISON's residence, detectives
found four separate packages of fentanyl totaling approximately
41.9 gross grams, two working digital scales with white powdery
residue, two 100 gram weights, and clear packaging containers.

37.    Detectives also located a red iPhone with a blue
protective case (the "SUBJECT DEVICE") on the kitchen counter at
HARRISON's residence.  The SUBJECT DEVICE was locked and
required a six-digit passcode to access the phone.  During an
interview, HARRISON refused to provide the six-digit passcode to
the SUBJECT DEVICE.  HARRISON was arrested for Cal. Health &
Safety Code § 11351 (Possession for Sale of a Controlled
Substance).

**F.    HARRISON Acknowledged Possessing the Fentanyl in Jail
Calls After His November 12 Arrest**

38.    From my conversations with Detective Woodward, I know
that on November 13, 2024, Detective Woodward accessed the
Ventura County inmate telephone system to monitor recorded

telephone calls made by HARRISON in the Pre-Trial Detention
Facility booking cell.  Detective Woodward monitored HARRISON's
telephone calls and told me the following:

39.  On November 12, 2024, at 2:54 p.m., after he was
arrested following the search of his residence, HARRISON placed
an outgoing call to his wife at the -0656 number previously
identified on other jail calls.  During the telephone call,
HARRISON's wife stated, "What were you thinking?"  HARRISON
described that he was watching television when law enforcement
arrived.  HARRISON's wife replied, "You frickin' shouldn't have
anything in our home."  HARRISON responded, "Dude I had
personal, little, barely any shit dude and they're trying to
tell me they found 40 grams. They're fucking lying dude."
HARRISON continued, "Babe, I promise I barely had anything. That
was personal use. That should have been a citation or a
misdemeanor, you know?"

40.  HARRISON asked his wife what law enforcement took from
the residence.  She began reading from the property receipt
which was left at the residence.  As she read the various
amounts of fentanyl located, HARRISON stated, "Wow dude, there's
no way there was 30 grams of fentanyl in there."  She asked
HARRISON why he had fentanyl in their home.  HARRISON responded,
"I took it out and I was getting sick, because the Suboxone
wasn't working. So I took a couple hits and then I fucking
didn't put it away. And I went and sat down and ate something
real quick. Then fucking boom! They kicked open the door while I
was eating."  HARRISON also stated, "I have a fucking addiction

15

dude. It's so hard for me to get off. It's so fucking hard, dude."

41.  HARRISON's wife said, "I told you when you when you frickin' got out on bail to make sure there was nothing in our house."  HARRISON responded, "And I did. I kept taking it out. But then I fucking, you were gone. You weren't there to book me, and everyone was at school so no one was there. So I went and took one hit and fucking bam. I left it out in the garage."

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

42.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

43.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

44.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

45.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## VII. <u>CONCLUSION</u>

46.  For all of the reasons described above, there is probable cause to believe that GEORGE HARRISON and CHASE KENNEDY have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _6th__ day of
January 2025.

_____
HONORABLE A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE